IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>) 3:15-cr-00044-8-JO<br>v. )<br>)<br>JOSE LUIS MAMANI-VIDAL, ) OPINION & ORDER<br>)<br>Defendant. )<br>_____ ) | |

JONES, District Judge,

Defendant is charged with several felony counts alleging he possessed with the intent to distribute heroin in furtherance of a drug distribution conspiracy. The matter is before the court on defendant's motion to suppress evidence obtained from the warrantless search of a duffel bag in which law enforcement officers found approximately seven pounds of heroin. [# 626] I heard testimony and received exhibits at an evidentiary hearing on February 10, 2017. During the hearing, I found that defendant abandoned the duffel bag and had no reasonable expectation of privacy as to its contents when the officers conducted their search. Accordingly, I denied his motion to suppress. I now supplement that ruling with the following findings of fact and conclusions of law.

## BACKGROUND

For several months before December 23, 2014, law enforcement personnel in an interagency task force were investigating a large scale heroin distribution conspiracy that was importing heroin from Mexico, transporting it to Portland, and distributing it regionally. In the course of the

-1-   OPINION & ORDER

investigation, DEA agents were wiretapping the telephones of several conspirators, including the regional leader of the conspiracy, a Portland resident named Chris Guillen-Robles. Defendant does not challenge the wiretaps in this motion. The interagency task force included agents of the Oregon State Police, the Clackamas County Sheriff's office, and other local agencies and had assistance from Special Agent Phil Brown of the DEA and Special Agent Ryan Parton of the FBI.

On the morning of December 23, 2014, Special Agent Brown was monitoring communications on the wiretapped phones when Guillen-Robles received a text message from a telephone with a Utah area code and a number ending in 8831. The person who sent the text message indicated that he would be arriving in Portland at 10:30 that night. By checking a de-confliction database of information derived from DEA investigations across the country, Special Agent Brown determined that the 8831 number had been seen in other investigations, including one in which the number had been associated with a heroin courier known as "Jose." From this, Special Agent Brown reasonably believed that a Hispanic male named Jose with a Utah telephone would be delivering heroin to Guillen-Robles in Portland at 10:30 that night.

Special Agent Brown was aware that another conspirator using a wiretapped phone had used a Greyhound Bus to travel to Portland the previous week. He determined that a northbound Greyhound Bus was scheduled to arrive in Portland at 10:30 that night. Based on this knowledge, Special Agent Brown informed members of the task force that it was likely a Hispanic male courier would arrive at the Portland bus station at 10:30 that night with a delivery of heroin.

Special Agent Brown continued to monitor communications in a remote wire room. Meanwhile, Special Agent Parton and approximately ten members of the interagency task force, including at least one drug sniffing dog, were deployed at the Portland bus station to await the arrival

of the 10:30 bus. At approximately 10:40 p.m., the agents in the wire room intercepted text messages indicating that the person with the 8831 number had arrived and was going to wait outside for someone to pick him up. Within minutes, the wire room agents transmitted this information to members of the task force at the bus station. From this, Special Agent Parton reasonably believed that the Hispanic male they suspected of carrying heroin had arrived and was outside the bus station waiting for a ride.

Meanwhile, task force officers inside the bus terminal observed two Hispanic males seated in the waiting area. A canine officer approached them, but his dog did not alert. The two men left the terminal and one of the task force officers followed them to a black Volvo station wagon parked outside. The officer recognized the car from earlier surveillance he had done connected with the same drug conspiracy investigation. The officer contacted the men and Special Agent Parton helped him conduct a consent search of the car. The two men then drove away.

At approximately 11:12 p.m., agents in the wire room intercepted a telephone call from the 8831 number to Guillen-Robles in which the caller said he was outside by a train stop and that he had seen police officers with dogs in and around the bus station. Special Agent Parton received this information and reasonably believed that the suspected courier was waiting at a TriMet train stop near the bus station. Indeed, video from security cameras at the TriMet stop on NW Fifth Avenue behind the bus station shows that defendant was standing by a ticket-dispensing kiosk at the TriMet stop when this call was made, although officers did not see the video until after the challenged search.

Special Agent Brown in the wire room intercepted a second call between Guillen-Robles and the 8831 number. In that conversation, Guillen-Robles said that the runners sent to pick up the

suspected courier were not answering their phones, and the two speculated that the runners might have been stopped by the police. The suspected courier said he wanted to move out of the area to be picked up by Guillen-Robles.

Meanwhile, Special Agent Parton walked outside toward the back of the bus station where he knew the tracks for the TriMet train ran to the north and south along NW Fifth Avenue. At approximately 11:22 p.m., Special Agent Parton walked north on NW Fifth Avenue next to the TriMet tracks and encountered defendant at the TriMet stop near a ticket kiosk. Special Agent Parton asked for defendant's identification and defendant gave him a Utah drivers license with the name Jose Mamani. Special Agent Parton asked to search a small backpack defendant was carrying, and defendant consented. While Special Agent Parton and defendant were talking, Sgt. Marc Wold walked past them and waited down the street where they were still in sight. After a brief conversation, Special Agent Parton resumed walking north. Immediately afterwards, Sgt. Wold saw defendant leave the area walking south. Within moments of ending his encounter with defendant, Special Agent Parton received a message from which he surmised that defendant fit the description of the man for whom they were looking. He returned to the TriMet stop, but defendant was gone. Special Agent Parton continued walking south looking for defendant, but did not find him.

When Sgt. Wold saw defendant and then Special Agent Parton walk away to the south, he walked back toward the TriMet stop along a wall behind the bus station that runs next to NW Fifth Avenue parallel to the TriMet tracks. Approximately 22 feet from the TriMet kiosk where Special Agent Parton had encountered defendant, Sgt. Wold saw a duffel bag sitting by some bushes next to the wall. Although it was a dark rainy night, the bag was clearly visible in plain view. Due to its proximity to the location where defendant had been, Sgt. Wold associated the bag with defendant.

-4-    OPINION & ORDER

He reasonably concluded from defendant's conduct that defendant had abandoned the bag.

Sgt. Wold informed the task force that he had found a bag and several officers converged at his location. No one in the area showed any interest in the bag and there was no one other than law enforcement personnel within several blocks of the location where the bag was found. The officers observed no identification tag on the bag. A canine officer arrived, and the dog alerted to the presence of a controlled substance in the bag. The officers then searched the bag and found the seven pounds of heroin that defendant seeks to suppress.

The government presented video from the security cameras at the TriMet stop showing that, before encountering Special Agent Parton, defendant placed a large bag in the area where Sgt. Wold found the duffel bag that was searched. This was not known to the officers at the time they conducted their search, however. The government also presented evidence that defendant left the area, was picked up by Guillen-Robles, and took a flight to Utah hours later. The officers did not know this at the time they searched the bag.

## STANDARDS

The fourth amendment protects against unreasonable searches and seizures by the government and applies to searches and seizures by state law enforcement officers through the fourteenth amendment. *Elkins v. United States*, 364 U.S. 206, 213 (1960). A warrantless search of abandoned property, however, does not violate the fourth amendment and a person who voluntarily abandons property has no standing to challenge its search and seizure. *Abel v. United States*, 362 U.S. 217, 240-41 (1960); *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). Abandonment is a question of intent inferred from words, acts, and other objective facts. *United States v. Kendall*, 655 F.2d 199, 201 (9th Cir. 1981); *United States v. Jackson*, 544 F.2d 407, 409 (9th

Cir. 1976). The determination is based on the totality of the circumstances and the inquiry must focus on whether, through objective indications, a person has relinquished interest in the property so that he has no reasonable expectation of privacy at the time of the search and seizure. *Nordling*, 804 F.2d at 1469.

## DISCUSSION

Examining defendant's conduct objectively I find that he abandoned the duffel bag containing the heroin before the warrantless search he challenges. He left the bag unattended in plain view without an identification tag to show an ownership interest. He deliberately walked away leaving the bag on a public street where any passerby would have access to it. I am satisfied that his actions are objectively inconsistent with a continued expectation of privacy in the property. *Nordling*, 804 F.2d at 1470.

I reject defendant's argument that an express verbal disclaimer of possessory interest is necessary to find that he abandoned the duffel bag. Defendant's actions alone provide an adequate objective basis to conclude that he intended to disavow any interest whatsoever in the bag and the heroin it contained.

I also reject defendant's argument that his actions showed an intent to retain a possessory interest in the bag by hiding it for later retrieval. As a factual matter, the bag was not hidden because Sgt. Wold found it in plain view in a public place. In addition, the task force officers knew from the intercepted texts and phone calls that defendant was aware of their presence. Knowing that police with drug sniffing dogs were in and around the bus station and suspecting that his transportation had been intercepted by police, the defendant walked away from the area leaving the bag behind. The most reasonable interpretation of the objective indications is that defendant intended to rid himself

of any connection to the bag and its incriminating contents. The objective factors fully supported Sgt. Wold's conclusion when he testified that it was clear to him that defendant had abandoned the bag. It makes no difference that defendant might have also retained some hope of retrieving the bag if the police or a passerby did not claim it first.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress [# 626] is DENIED.

IT IS SO ORDERED.

DATED this 15th day of February, 2017.

*Robert E. Jones*
United States District Judge